Charles Wade v. Gordon Lewis and we have Tiffany Johnson for the appellant and Joe Reynolds for the appellee. Ms. Johnson, are you ready to proceed? Yes, your honor. And I see that you've reserved five minutes for rebuttal, is that correct? Yes, your honor, that's correct. Okay, you may proceed. Good morning, may it please the court, my name is Tiffany Johnson and I plaintiff alleges an officer was deliberately indifferent to his medical needs, that officer is shielded from suit and damages by qualified immunity unless the plaintiff can show two things. First, that the officer's conduct violated constitution. And second, taking all of the specific circumstances into account, the law was already clearly established at the time that such conduct was unlawful. This court has framed the plaintiff's burden as to this second prong or the clearly established prong as having to show an officer's conduct was, quote, so obviously wrong in the light of pre-existing law that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing. Here to demonstrate that law was so clear such that every reasonable officer would have known that Captain Lewis was violating the constitution when he escorted Mr. Wade to the shoe, Mr. Wade has pointed to this court's decision in Aldridge versus Montgomery, and he argues that it has indistinguishable facts from the facts of this case. But as this court has held several times since Aldridge, this case is not Aldridge, and it does not clearly establish a constitutional violation under the specific facts of this case. So when we look at Aldridge, the facts of that case are that... So what about... Oh, go ahead, Judge Schiff. Do we know what the facts are in this case? I've tried to find out, determine precisely what when they left the dining hall to the new facility where he was housed next to the medical facility. Mr. Lewis doesn't know anything, hardly at all, in his testimony. He has very vague memory, and certainly no memory about going over there to the new location. And the... Mr. Wade, by my understanding, it says that he was there, the captain went along, Lewis went along with two others, and they got him to the cell. That's all we know. Do we know walkover? According to Mr. Wade, he explained to Captain Lewis, I'm bleeding over here, are you going to take me to medical? Okay, and who was with Captain Lewis? We know that Captain Lewis was with two or three other executive officers of the prison. We don't know who those officers were. Well, precisely. We don't know precisely who those officers were. Well, somebody knows who they were. This is, my problem here is this is an organizational situation. You have the warden, you have the sub wardens, you have the captains, and you have lieutenants, and they're in different places. And so if I were the captain, I'd be arguing that any over there. We know nothing at all. Yes, Your Honor. And that is partly due to... That's partly due, in fact, to the circumstances of Mr. Wade being taken over to the chute. This was an emergency situation. No, because the government, your client, has not investigated this case and found out what happened. Well, Your Honor. Your brief doesn't tell us anything. Well, I can only... It does recite that statement that Wade made about medical attention and the captain's response, and that is all. Correct. And those are the only facts we know as far as Captain Lewis's interaction with Mr. Wade. And we don't know about the others there. You don't know who they are. We do not know who those officers were, Your Honor. With that being said, Your Honor, we do know that Captain Lewis only interacted with Mr. Wade for that brief period of time between the body alarm at 1.41 p.m. and when Mr. Wade entered the chute and logged in at 1.50. From there, we know from Mr. Wade's testimony that he interacted with several other officers in the chute asking to be taken to medical... Whatever that means. We don't know what that means, and we don't know who the other officers are. But you know. The prison does. I do not know who those officers were, Your Honor. Well, no. I mean, the prison does know. Your client does know. Your real client. I can assure you, Your Honor, we had records to establish who was with Captain Lewis. All somebody had to do was make a little bit of an investigation. Yes, Your Honor. But based on the facts... Yes, Your Honor. Well, I was going to ask. Right now, we're taking Wade's facts as true. And he says that he was taken to medical and was refused. How would you differentiate those facts from Aldridge? So, I think the biggest difference between this case and Aldridge are the circumstances surrounding the decision-making by Captain Lewis. So, we know that in Aldridge, the officers that were sued ultimately watched this inmate for up to two and a half hours bleeding from the forehead and observing a pool of blood on his clothes and on the floor. We know that they ultimately made a call to a detective letting him know that they needed medical attention for this detainee, and the detective decided to stay off scene for another 90 minutes. The difference here is that Captain Lewis, having a limited interaction, that nine-minute window interaction, he had to make a decision in an emergency scenario because Mr. Wade had assaulted another inmate, and they needed to take that other inmate to a separate location. You know, the prison policy, based on the testimony of Captain Lewis and Lieutenant Wilson, is that prison policy requires that these inmates be separated, not only for the safety of the inmates, but for the safety of the officers. So, we know that Captain Lewis needed to separate these inmates, but also take Mr. Wade, who was believed to have assaulted another inmate, to a separate part of the prison for administrative confinement while the fight was being investigated by the FIS lieutenant. The other thing that stands out to me is that nine-minute window. So, unlike a lot of the defendants in, let's say, the Humans case, or the Hill case, or the Fernandez case, where they're having extended interactions with these inmates, and they're seeing their injuries develop, and they're seeing, let's say, a disoriented inmate, or an inmate complaining of pain, here, Captain Lewis had the one comment from Wade saying that he was bleeding. He had the request for Mr. Wade to be taken to medical, despite the fact that Mr. Wade's victim was also being taken to medical, and Captain Lewis took him to a location where there was a medical unit, where he could receive medical attention. So, this is not an inmate who was being left in a hole somewhere where he's being ignored. We know, even from Mr. Wade's testimony, that he was able to reach out to officers in the SHU and ask to be taken to medical, and he was seen 10 minutes after being escorted into the SHU by a separate FIS lieutenant who investigated the assault. So, all of those circumstances play into whether Mr. Captain Lewis had noticed that under these particular set of facts, that what he was doing by taking him to one location that had a medical unit, instead of directly to another medical unit, would constitute a constitutional violation. I think this court's decision in the Eumanns case, the Hill case, the multiple cases we cited in our brief, demonstrate that those facts have to be taken into consideration, not just the fact of the injury or how long Mr. Wade sat in that holding cell. All of the facts. And his bleeding had stopped after about 15 minutes, correct? And I don't want to overstate the facts, Your Honor. Mr. Wade admitted that when the FIS lieutenant took that picture 10 minutes after he was in his cell, that the bleeding had, quote, tapered off. And you can see in that photograph what that meant. And I see my time has expired, Your Honor. You can just wrap it up. But from that perspective, Your Honor, we can see that this was not blood pooling on the floor in the same way that it was in the Aldridge case. It wasn't continuing to bleed in the way that a head wound does for two and a half hours. And for that reason, and all the other reasons stated in our brief, Your Honor, we respectfully ask the court to reverse the decision of the district court and hold that Captain Lewis is entitled to qualified immunity. Thank you, Ms. Johnson. Mr. Reynolds. May it please the court. Joe Reynolds for Mr. Charles Wade. It's undisputed in this case that Mr. Wade was bleeding profusely when the Captain Lewis approached him. Mr. Wade asked to be given medical care. And as the magistrate judge found, which Captain Lewis does not contest, Captain Lewis intentionally denied the medical care and threw Mr. Wade into the chute. So this case very much is from, as far as Captain Lewis is concerned, that he did leave Mr. Wade in a hole somewhere, leaving Mr. Wade to his own devices to try and secure medical care, as a result of which, three days later, he asked to have surgery on his hand. The core problem with this appeal is that Captain Lewis is trying to inject facts that are not in the record. And those are that there was some legitimate reason for Captain Lewis to throw an inmate that's bleeding profusely into the chute, or that there was some expectation that Mr. Wade would eventually receive medical care. Counselor, Captain Wade had other people with him, and we do not know who they were, do we? No, sir, we do not know. We don't know whether or not Captain Wade said to a lieutenant, take care of this situation, and I'm leaving. No, sir. We don't know that, do we? No, sir, we do not know. That might have happened, but of course, nobody did any investigation to find out who was there. You don't know who was there. No, sir, and that might be something they try to prove in trial. Well, that may be later on, but you took Captain Wade's deposition, Lewis's deposition, and he doesn't have any recollection of the event at all, with minor exceptions. That's right, Your Honor. And with no recollection whatsoever, the district court of Captain Lewis whatsoever, the district court found, this is from the district court's opinion, there is no evidence in the record suggesting that defendant decided to place plaintiff into the shoe without medical treatment for a legitimate reason or otherwise expected plaintiff to receive medical treatment at some point in the future. Do you dispute the fact that under prison regulations, where there's an assault or an incident, the inmates needed to be separated? No, Your Honor, we do not dispute that. Wouldn't that be evidence of why he was taken to the shoe? Well, there is a difference between taking an inmate to the shoe and then denying an inmate medical care in the face of that inmate bleeding profusely. And there's evidence in the record, this is from the magistrate judge's opinion, that a medical, this is, you know, according to Lieutenant Wilson, regardless of how an inmate receives an injury, medical staff must be notified. So the mere fact that Mr. Wade could have received medical treatment in the shoe does not necessarily mean that medical staff was notified to provide that medical care. And that's exactly what happened in this case. So you said bleeding profusely, and then you said he needed surgery three days later, but there is an intervening medical care. We have nurse innates come in and do the wound treatment. And how do you get past the fact that, you know, she cleaned the wound, she rinsed the wound, she put antibiotic ointment on it and did a couple of little butterfly stitches and did not recognize that this was a surgical need, that there was a tendon that was severed? How do we get past her treatment? So we have sued Captain Lewis. And the question with respect to Captain Lewis's liability is, when you have a inmate that presents with a serious medical need, that it is bleeding profusely, and that, you know, there's no dispute that the nature of his injury posed a substantial risk of harm to Mr. Wade, what do you have to do about it? And in this case, the record as construed by the district court, which Captain Lewis does not dispute, is that he simply did nothing. He threw him into the shoe without any regard whatsoever that Mr. Wade would eventually receive care. So on that issue alone, you know, what Nurse Bennett did up to seven hours later should be irrelevant to the captain's liability. With respect to this idea that, well, you know, Nurse Bennett looked at the picture during her deposition of the hand that was taken about 30 minutes later and said, I don't think that that's a medical injury. Well, she also said that it's an open wound. It's still bleeding. She would definitely need to see him and care for his hand. And so it was with respect to that picture in particular that Captain Lewis was shown that picture during his deposition and said that that is exactly the type of injury that would require me to call medical for that inmate. So, you know, Nurse Bennett's view of that picture is, you know, one, irrelevant. But Captain Lewis himself said that that picture, you know, calls out for an inmate that requires medical care. It's also worth noting that Nurse Bennett testified that she did not have training on whether or not, like, a wound would need to have stitches. She didn't have that kind of training. Mr. Wade testified that Nurse Bennett looked at it and said, oh, this definitely needs stitches. And then she writes in her note that, you know, needs to be seen by a doctor. And then, you know, so then the next day, Mr. Wade is ultimately seen by a doctor. But with respect to the issue here, what we're really talking about is Captain Lewis's conduct. And I can go through, you know, just very briefly, we've got a broken bone, 1.34 inch laceration that went all the way down to the broken bone. Counsel, he told Ennis that he cut his hand on a can. Is that right? That's right, Your Honor. Wait a minute. The story that he cut his hand on a can lasted until he saw the doctor, didn't it? Could you repeat that, Your Honor? He was steadfast in his position that he cut his hand on a can. That's right, Your Honor. When Captain Lewis had left the scene, all we know is, according to Mr. Wade, is that he cut his hand on a can. That's right, Your Honor. Yes, sir. Didn't it have the bleeding? Oh, go ahead. That's right. So the broken bone wasn't known to anybody, wasn't suspected by anybody. That's right, Your Honor. What we, what's in the record about what could be known is that, this is Mr. Wade's testimony, that he was bleeding all over this place, leaking blood all over, and bleeding to the degree that there is a trail of blood following him. There's also testimony that he did bleed up until seven hours. Now, he did testify that at the time the picture was taken, which, by the way, it still shows blood, that the bleeding was tapering off. That's the word, tapering off. Not stopped, but tapering off. And the magistrate judge, the way that, you know, he found the fact in construing the record was, and although Plano testified that the blood was tapering off when the photographs of Plano's injury were taken, he also testified that he continued to bleed the entire time he was in the shoe before he finally caught nurse's attention. And so, this is not a simple case where there is some dry blood on a cut. This is bleeding profusely, as construed by the, you know, the record as construed by the district court of the magistrate judge. Is it fair to, is it fair to characterize it as bleeding profusely if he testified that 10 minutes after he arrived at the shoe, the blood was tapering off? I think, I think that it is that a, a reasonable juror could find based on the record that the blood was bleeding profusely. And notably, you know, Captain Lewis does not challenge the district courts for the magistrate judge's findings, but, you know, Dr. McMahon, who ultimately treated Mr. Wade's hands, testified that there would be blood with this kind of injury because it goes all the way down to the tendon. It tore, you know, his injury was a partially severed tendon. So, based on the nature of the injury, combined with Plano's testimony, that, you know, there's, there's enough evidence in the record to suggest that it was bleeding profusely. And, and, and for blood to trail behind someone, that's a significant amount of blood. So, the fact that, you know, about 30 minutes later from, from the time that the injury happened to when that photograph is taking and he says it's tapering off, for the blood to, to, to taper off, that, you know, that, that is completely consistent with the blood initially bleeding profusely. The tapering off comment happened at the 15-minute mark or the 30-minute mark? The 30-minute mark. The tapering off comment is, is a question to Mr. Wade during his deposition about the picture. And it's at this time, you know, do you agree that this, that the blood is tapering off? And that picture is taken approximately 30 minutes after the, the, the, the, the, the, the, the injury to the hand occurs. Because there is some delay in the injury of the hand. Officers come down. Then they escort Mr. Wade to the shoot. Then he gets in there. And then the picture's taken. And overall, that's about, that's about 30 minutes. But you say in your brief that the facts of this case are more egregious than Aldridge. And in that case, we have a situation where an inmate has a cut to the forehead and the pool of blood is collecting over the period of, I think, like two and a half hours. How is this, you know, yes, bleeding profusely, trail of blood, but then tapering off? How is this worse? So this is what the district court found about this case. Presuming that the defendant was aware of plaintiff's serious medical needs, he had a duty to do something. Summon medical personnel or alert other guards to plaintiff's need for medical care, other than simply ignoring the injury. What we have here is a prison guard confronted with a hand that's bleeding profusely and intentionally denying care. The guards in Aldridge watched for, you know, I think two hours, hour and a half, two hours. And the reason was we're waiting for detectives to come. This is a situation where it's immediate. Injuries happen. He's aware of a serious medical need. There's no dispute that he's aware of a serious medical need. And instead of, you know, sitting there watching him for two hours, he immediately denies medical care and throws him into the shoe. But also the prison has gone into lockdown as a result of this fight. That's right. That's correct. That's correct. But all Captain Lewis had to do was ask for medical care for Mr. Wade. And then he would have been given medical care and he wouldn't have languished in the shoe, you know, for three days and then had to have surgery on his hand because of an infection. Mr. Reynolds, how do you address our humans case from 2010 where we distinguished Aldridge and held that an officer was entitled to qualified immunity when an arrestee had visibly bloody cuts and abrasions to his head and the defendants detained him for four hours before he received medical assistance? So there's two ways. There's factually, I think, and legally. The person that was booked on robbery charges and human never requested medical treatment. There were visible abrasions on the head, face, shoulder, and hand. You know, here we have a significant bleeding cut that is bleeding profusely, bleeding all over the place. And putting aside Aldridge and this idea of, is there some sort of delay in treatment? Is there a reason, a justifiable reason for the delay? I think it's, I want to make clear that, you know, the district court found that, you know, presuming that the gas was a serious medical condition, it was clearly established that under the Eighth Amendment, prisoners have a right to receive medical treatment. And the magistrate judge found the same thing that, you know, in 2014, failing to provide medical care to an inmate with broken bones could constitute deliberate indifference. And so, you know, you've got the district court side of Taylor versus Hughes, 920 and 3D, 729. And the capitalist never addresses this in the brief. You know, they're speaking with Aldridge, but at the end of the day, this is an intentional denial of medical care type case with respect to capitalists. Thank you, Mr. Reynolds. Ms. Johnson, you have five minutes. Thank you, Your Honor. I want to focus the court back on the humans case and focus on those facts, because one thing that Mr. Wade's counsel has spent a lot of time on is the finding of deliberate indifference. And we are here today to talk about the finding that the law was clearly established. And whether or not, regardless of the finding of deliberate indifference, we have to look at the facts of this case and determine whether the facts and circumstance of this case line up with existing law. And the only case that Mr. Wade has relied on is the Aldridge case. But when we look to the humans case, the court in humans did not find that the three hours that defendant officer spent with Mr. Newman was an outright denial of medical care. The court in that case said that where there was visible blood and Mr. Wade's counsel made a point of saying that Mr. Newman's never requested medical attention. But during the three hours that defendant spent with Mr. Newman, he exclaimed, ouch and out, and appeared to be disoriented at times. He complained that the officers had cracked something in his hand and indicated he had blurred vision. Counsel, do we know how far it was from the dining hall to the shoe where he was incarcerated? Do we have a diagram, any kind of diagram? I've been in that prison. Do we have a diagram which shows how far it is from the dining hall to the shoe? That's first. And second, where during the trip between the dining hall and the shoe did Mr. Wade elicit from, basically from Lewis, the statement about medical care? Well, your honor, I do believe there is a hand-drawn diagram in the record of Mr. Wade's deposition. And it shows us the distance between the dining hall and the shoe. It shows the relative proximity of the dining hall. Your honor, I don't know the exact distance. How long did it take him to walk from there to the shoe? Your honor, I've walked that distance. No, no, no, no, no, no. What does the record tell us about how long it took to go from the dining hall where they picked up Wade and took him to the shoe? Do we know how long? The only evidence in the record, your honor, is the timestamp from the body alarm going off. 20 minutes. It's nine minutes, your honor. Well, it's 140 to 210, wasn't it? 140 to 150. Mr. Wade was, he arrived in the shoe and he appears in the shoe log at 150, which is nine minutes after the initial body alarm. All right. When during the trip did Wade talk to him about needing a doctor? Mr. Wade indicated that as soon as he started the walk over to the shoe, he asked if he could be seen by medical and said that he was bleeding. So sometime in that nine minute window, your honor. All right. And your honor, I would just finally get to the point that Aldridge dealt with officers who, like the officer in human, spent hours with an inmate who was bleeding the entire time. And I don't, this court has not come to the conclusion at any point since Aldridge or during Aldridge that an officer who has a brief interaction with an inmate is responsible for everything that happens to that inmate thereafter. And every element of its deliberate indifference must be clearly established, including causation. And there's no evidence in the record that after Captain Lewis had that nine minute interaction with Mr. Wade, that he also knew that he continued to bleed and that he continued to complain and that he continued to be in pain. The only information that officer Lewis had was that Mr. Wade said, I'm bleeding everywhere. And are you going to take me to medical? And that brief interaction is not clearly established as violating Mr. Wade's constitutional rights. Do we know if anyone else was tasked with monitoring Mr. Wade while he was in the shoe? There's no evidence, your honor, in the record as to who was tasked or if there was someone tasked. But we do know from Mr. Wade's testimony that he had the ability to speak with officers in the shoe. So there were officers monitoring him in the shoe, and he had a subsequent interaction 10 minutes after arriving in the shoe with an SIS lieutenant who also used his hand, took a photo of it. Thank you, Ms. Johnson. Thank you, Mr. Reynolds. And we are in recess until tomorrow morning. Thank you, your honor. Thank you. Thank you.